*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0022p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

INTERNATIONAL UNION et al.,

> *Plaintiffs-Appellees,*

*v.*

No. 05-3190

CUMMINS, INC.,

> *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 04-07125—James G. Carr, Chief District Judge.

Argued: December 9, 2005

Decided and Filed: January 18, 2006

Before: DAUGHTREY, GILMAN, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Gregory J. Utken, BAKER & DANIELS, Indianapolis, Indiana, for Appellant. Joan Torzewski, HARRIS, RENY & TORZEWSKI, Toledo, Ohio, for Appellees. **ON BRIEF:** Gregory J. Utken, Dustin D. Stohler, BAKER & DANIELS, Indianapolis, Indiana, for Appellant. Joan Torzewski, HARRIS, RENY & TORZEWSKI, Toledo, Ohio, for Appellees.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. In this labor arbitration dispute, the primary issue is whether the suit to compel arbitration filed by International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and its Local 336 (collectively, the Union) was barred by the statute of limitations. This appeal also raises issues as to whether the underlying dispute was arbitrable and whether the Union's suit was barred by laches.

The Union was the recognized collective bargaining agent for employees at the Atlas Crankshaft Factory in Fostoria, Ohio for many years. Cummins, Inc. owned the Atlas plant until 1999, when it was sold to Krupp Hoesch Automotive of America, Inc. The Union and Cummins negotiated a Plant Sale Agreement (PSA) that obligated Cummins to fund "Plan B," a pension plan benefitting former hourly employees who had worked at the Atlas plant and hourly employees who would continue to work there after the sale to Krupp. The PSA provided that Plan B was not to be amended or terminated without the mutual consent of the Union and Cummins. In late 1999, Cummins determined that Plan B was underfunded, and it notified the Union that it was considering

1

merging Plan B into Cummins's well-funded Plan A for its other employees. This merger occurred in October of 2001. In December of 2001, the Union notified Cummins that, in its view, the merger violated the "no termination/no amendment" clause of the PSA, and it filed a grievance.

Over the next two-and-a-half years, the Union and Cummins corresponded regarding the arbitrability of the grievance, culminating in the Union filing suit to compel arbitration in March of 2004. The district court granted summary judgment in favor of the Union, holding that the Union's action to compel arbitration was timely, that the dispute was arbitrable, and that Cummins's laches defense was inapplicable. For the reasons set forth below, we **AFFIRM** the judgment of the district court and **REMAND** the case for referral to arbitration.

## I. BACKGROUND

Article 5 of the PSA requires Cummins to sponsor and fund Plan B, and further provides that "[t]he plan shall not be amended or terminated except by mutual agreement between the Company and the Union except as may be required by law or regulation." On the other hand, Article XIX of Plan B outlines the benefits that the employees are to receive "[i]n the case of any merger or a consolidation with, or transfer of assets or liabilities to, any other plan." Finally, Cummins and the Union agreed in Article 16 of the PSA to arbitrate any alleged breaches of the PSA.

Cummins determined in 1999 that Plan B was underfunded. It then notified the Union that it wanted to merge Plan B into Plan A, the pension plan covering Cummins's salaried employees and executives. Ken Lortz, the Union's Assistant Regional Director, requested information about the merger from Hudnall Pfeiffer, Cummins's counsel, and suggested that the parties arrange a conference call to discuss the potential merger. Lortz and Pfeiffer corresponded over the next few months, with Lortz asking for information about the details of the merger and Pfeiffer submitting information regarding the funding methods, assets, and liabilities of Plan B.

In August of 2000, Cummins's employee David Wright told Lortz that Cummins was no longer interested in merging the plans. But Cummins had filed a Notice of Plan Merger with the IRS in 1999 and never in fact abandoned the proposed merger. David Price, a Cummins employee, first notified Lortz in November of 2001 that the merger had taken place the prior month.

On December 3, 2001, the Union filed a Notice of Intent to Arbitrate, claiming that the merger violated Article 5 of the PSA, which provides that Plan B is not to be amended or terminated without the Union's consent. The parties communicated over the next two-and-a-half years concerning the alleged breach of the PSA. A summary of their relevant conversations and correspondence is set forth below:

**February 14, 2002:  Telephone call between Pfeiffer and Lortz**
- Lortz accuses Pfeiffer of acting in bad faith and asks Pfeiffer to send him information concerning the merger.

**February 20, 2002:  Letter from Pfeiffer to Lortz**
- Claims that the merger discussions with Lortz got "bogged down."
- Indicates that the PSA contemplated a merger and that the merger did not require amending or terminating the plan.

**March 14, 2002:  Letter from Pfeiffer to Lortz**
- Attaches a "redlined" copy of Plan B, but states that none of the changes are relevant to the merger.

**June of 2003:**  Lortz and Dave Glover, a Cummins executive, mutually select an arbitrator to hear the case.

**June 9, 2003:  Letter from Lortz to Pfeiffer**
- Acknowledges that the grievance is still unresolved.
- Notifies Pfeiffer that Cummins and the Union have mutually selected an arbitrator.
- Offers to contact the arbitrator in order to set up mutually acceptable dates for a hearing.

**June 23, 2003:  Letter from Pfeiffer to Lortz**
- States that he is "surprised" that the Union is still pursuing the arbitration and that he had assumed the Union had dropped the matter.
- Reminds Lortz of an earlier conversation when Cummins explained that the plan was not "amended" when the merger occurred.
- Reiterates that the company is responsible for funding the plan and that the merger saved the plan from underfunding.
- Claims that the employees are actually better off after the merger.
- Reminds Lortz of his promise to have Sharon Meadows, counsel for the Union, contact Pfeiffer and "once again request[s]" the Union to forward him "any legal authority or other basis to support its conclusion that Cummins should have amended the plan."
- Claims that the grievance is not arbitrable because the PSA prohibits amending the plan, but does not prohibit failing to amend the plan.  So, if the Union's position is that Cummins should have amended the plan, there is no breach.

**June 26, 2003:  Letter from Lortz to Pfeiffer**
- "[T]akes exception" with Cummins's "twist[ed]" characterization of the Union's position.
- Argues that whether an issue is arbitrable is for the arbitrator to decide.
- Claims that the Union's position—that Cummins's decision to unilaterally amend the plan violated the PSA—has not changed.
- States that the Union "intend[s] to move forward to arbitration" unless it reaches an agreement with Cummins.

**July 9, 2003:  Letter from Pfeiffer to Lortz**
- Claims that whether the plan was amended was not in dispute.
- Cites caselaw holding that the issue of arbitrability is one for the court, rather than the arbitrator, to decide.
- Argues that the merger benefitted, rather than harmed, the bargaining-unit employees.
- Suggests that "it is time to move on."

**August 1, 2003:  Telephone call between Lortz and Pfeiffer**
- Pfeiffer informed Lortz that the grievance is not arbitrable and requested again that the Union forward him the legal basis for its position.

**August 20, 2003:  Letter from Pfeiffer to Lortz**
- States that the attempt to schedule a conference call was fruitless.
- Requests that the Union provide Pfeiffer with a statement of its position and supporting legal authority.

**September 3, 2003:  Letter from Joan Torzewski (counsel to the Union) to Pfeiffer**
- Articulates the Union's position that "a merger constitutes an amendment."
- States that "[n]either the collective bargaining agreement nor applicable case law" requires the Union to provide legal support for its position, because a party does not have to establish the underlying merits of a claim before arbitration.

• Blames Cummins for the "inordinate delay" and states: "We would like to ask the arbitrator for dates.  If you are refusing to arbitrate this matter please advise within the next ten (10) days so that the Union may begin the appropriate litigation to compel arbitration."

**September 16, 2003:  Letter from Pfeiffer to Torzewski**
• Claims that the Union voluntarily agreed to provide Cummins with authority for the Union's position.
• Urges Torzewski to reconsider her position in light of this background and again requests information regarding legal authority.

**October 15, 2003: Letter from Torzewski to Pfeiffer**
• Clarifies that the Union's position is not that Cummins *should have* amended the plan, but that the merger *constituted* a unilateral amendment.
• Claims that it is up to the arbitrator to determine whether Cummins breached the agreement.
• Hopes that the parties will "promptly progress to arbitration."

**February 12, 2004:  Letter from Torzewski to Pfeiffer**
• Notes that Pfeiffer did not respond to her October 15th letter.
• Asks if the arbitration should proceed on the briefs or with a hearing.

**March 4, 2004:  Letter from Pfeiffer to Torzewski**
• Claims that the Union has never pointed to specific language in the plan that constitutes an amendment.
• States that Cummins "continue[s] to believe that there is no dispute under the Plant Closing Agreement that is arbitrable."

Following Pfeiffer's last letter, the Union filed suit to compel arbitration on March 17, 2004. The district court granted summary judgment in favor of the Union, rejecting Cummins's argument that the suit was barred by the statute of limitations and laches.  Because the parties agreed to arbitrate "alleged breaches of the [Plant Sale] [A]greement," the district court determined that the grievance was arbitrable.  This timely appeal followed.

## II.  ANALYSIS

### A.     Standard of review

The district court's grant of summary judgment is reviewed de novo.  *Minadeo v. ICI Paints,* 398 F.3d 751, 756 (6th Cir. 2005).  Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.     Statute of limitations

The Union and Cummins agree that the present suit is governed by the six-month statute of limitations established by Section 10(b) of the National Labor Relations Act (NLRA).  *See DelCostello v. Int'l Bhd. of Teamsters et al.,* 462 U.S. 151, 169 (1983) (applying the six-month statute of limitations from the NLRA to claims made against employers or unions pursuant to 29 U.S.C. § 165).  As applied to this case, the period begins to run "when the employer takes an

unequivocal position that it will not arbitrate." *McCreedy v. Local Union No. 971 et al.*, 809 F.2d 1232, 1237 (6th Cir. 1987) (holding that the six-month statute of limitations barred the employees' claim). Because the Union filed its action to compel arbitration on March 17, 2004, the question is whether Cummins unequivocally communicated its refusal to arbitrate before September 17, 2003.

The Union believed that Cummins's refusal was equivocal until March 4, 2004, just 11 days before the Union filed its suit in the district court. Cummins argues, however, that it unequivocally communicated its refusal to arbitrate in June, July, and August of 2003. In the June 23, 2003 letter from Pfeiffer to Lortz, Pfeiffer claims that he was "surprised" that the Union was still pursuing the grievance because he assumed that the Union had dropped the matter. Pfeiffer also stated that the grievance was not arbitrable, and he requested that the Union provide him with legal authority for its position. In his July 9, 2003 letter to Lortz, Pfeiffer suggested that the Union "move on." Finally, in the telephone calls and letters exchanged between Pfeiffer and Lortz in August of 2003, Pfeiffer both stated that the grievance was not arbitrable and requested that the Union explain its position and the authority on which that position rested. Cummins bases its statute-of-limitations defense on these communications in the summer of 2003.

The cases on which Cummins relies to support the claim that its refusal to arbitrate was unequivocal, however, are easily distinguishable. Cummins first draws an analogy with *Communications Workers of America v. Western Electric Co.*, 860 F.2d 1137 (1st Cir. 1988) (*CWA*) (holding that the union's suit was barred by the six-month statute of limitations). In *CWA*, the First Circuit held that the company's refusal to arbitrate was "immediate, blunt, and to the point" because it flatly refused to arbitrate despite four requests from the union. *Id*. at 1145. Cummins's responses to the Union in the present case, in contrast, were not immediate, blunt, or to the point. Although the company in *CWA* immediately notified the union that it was refusing to arbitrate, Cummins and the Union in the present case mutually selected an arbitrator in June of 2003, just days before Cummins claims that its refusal to arbitrate was unequivocal. Far from being blunt, Cummins "respectfully suggest[ed]" that the Union "move on," and it repeatedly asked for clarification of the Union's position. Although Cummins did state that the grievance was not arbitrable, its refusal was peppered with other comments indicating that it was willing to negotiate. Cummins, moreover, failed to respond to the Union's September 3, 2003 letter that specifically asked Cummins to indicate whether it was refusing to arbitrate the grievance. After ignoring the Union's direct request, Cummins cannot now claim that its refusal to arbitrate was unequivocal in the summer of 2003.

The second case on which Cummins relies is *International Union v. Michigan Plastics Products Co.*, No. G89-10608, 1990 WL 482463 (W.D. Mich. Oct. 22, 1990) (unpublished) (holding that the union's case was barred by the six-month statute of limitations). This case is also inapposite. In *Michigan Plastics*, as in *CWA*, the company promptly refused to arbitrate without ever indicating otherwise. *Id*. at *1. Cummins, however, repeatedly asked the Union to clarify its position, suggesting that it did not understand the Union's argument. As the district court stated, "If [Cummins] did not understand the issue and the claim—and it admitted as much in its letters—it could not have unequivocally refused to arbitrate the dispute."

Cummins attempts to undermine the district court's reasoning by asserting that "[p]ublic policy is better served by a rule that permits the declining party to at least listen to the other party's attempt to change its mind during the limitations period." This argument, however, is not supported by the caselaw. The applicable standard requires that the refusal be unequivocal, which implies that any negotiation must occur *before* the company refuses to arbitrate and the statute of limitations begins to run. In *CWA*, for example, the court stated that there is ample time for informal negotiation before the employer unequivocally refuses to arbitrate, and that "a suit to compel arbitration will be necessary only when more casual processes of dispute resolution have irretrievably collapsed." 860 F.2d at 1144. Although the labor laws encourage the parties to "listen" to each other, the unequivocal refusal to arbitrate required by the caselaw suggests that the employer

must essentially determine that negotiation or persuasion is not feasible before the statute of limitations will begin to run.

Cases from other circuits support this conclusion. In *Aluminum Brick and Glass Workers International Union v. AAA Plumbing Pottery Corp.*, 991 F.2d 1545 (11th Cir. 1993), for example, the Eleventh Circuit held that the union's motion to compel arbitration was not barred by the six-month statute of limitations period because the company's statements that "I'm sure you will agree that the matter is closed" and "I . . . would be interested to see what the Union's position is" were not unequivocal refusals to arbitrate. *Id*. at 1548; *see also Indep. Coca-Cola Employees' Union of Lake Charles v. Coca-Cola Bottling Co. United Inc.*, 114 F. App'x 137, 142 (5th Cir. 2004) (unpublished) (distinguishing *Aluminum Brick* because "there is no record evidence that Coca-Cola engaged in any conduct subsequent to its . . . letter that could be seen as casting doubt on its stated position."); *Int'l Ass'n of Machinists v. Caribe,* 913 F. Supp. 105, 109 (D. P.R. 1996) (holding that a letter from the company to the union requesting clarification of the union's position was not an unequivocal refusal to arbitrate because it "suggest[ed] that perhaps the disagreement between the parties involved a misunderstanding, and not a difference of opinions about which no compromise could be reached"), *aff'd in pertinent part*, 108 F.3d 422 (1st Cir. 1997). Similarly, the district court in the present case held that "[g]iven [Cummins's] repeated requests for counter-argument," the refusal to arbitrate was deemed equivocal until March of 2004.

But Cummins argues that the district court's conclusion that the refusal was equivocal until March of 2004 is illogical because the company's letter that month stated that "[Cummins] *continues to believe*" that the dispute is not arbitrable. (Emphasis added.) According to Cummins, the use of the word "continues" proves that its refusal was unequivocal long before the March 2004 letter. This argument, however, ignores the broader context of the discussions between Cummins and the Union. Although Cummins did state in June of 2003 that the grievance was not arbitrable, its subsequent conduct, discussed above, suggested that it was still open to negotiating with the Union. Because the March 4, 2004 letter was the only one that stated the grievance was not arbitrable without requesting further information from the Union, we believe that this is the date when Cummins's refusal to arbitrate became unequivocal.

Finally, Cummins argues that the Union promised to provide authority for its position but repeatedly refused to do so. The brief answer to this argument is: So what? Even if the Union had agreed to enlighten Cummins with legal authority, Cummins does not claim that the Union was legally required to do so. If Cummins's refusal was truly unequivocal before March of 2004, moreover, it would have been unpersuaded regardless of the Union's position. We therefore agree with the district court's holding that the six-month statute of limitations does not bar the Union's suit.

## C.       The arbitrability of the grievance

Cummins also argues on appeal that the district court erred in concluding that the parties had agreed in the PSA to arbitrate the type of dispute in question. Whether a dispute is arbitrable is governed by four principles set forth in *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 648-51 (1986) (holding that arbitrability is for the court, rather than the arbitrator, to decide). The four principles have been summarized by this court as follows:

> 1) a party cannot be forced to arbitrate any dispute that it has not obligated itself by contract to submit to arbitration; 2) unless the parties clearly and unmistakably provide otherwise, whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is an issue for judicial determination; 3) in making this determination, a court is not to consider the merits of the underlying claim; and 4) where the agreement contains an arbitration clause, the court should

> apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*United Steelworkers of Am. v. Mead Corp.*, 21 F.3d 128, 131 (6th Cir. 1994) (holding that the dispute was subject to arbitration where the company failed to produce any forceful evidence to suggest that the grievance should be excluded from arbitration) (citation and quotation marks omitted). In cases involving broad arbitration clauses, moreover, this court has "found the presumption of arbitrability 'particularly applicable,'" and arbitration will be denied only if an express provision excludes a particular grievance from that forum. *Id.*

Although Cummins acknowledges that the PSA prohibits amendment or termination of Plan B without mutual consent, Cummins claims that Plan B was not amended or terminated because the plan gives Cummins the option of funding the plan by merging it with another plan. It also disagrees with the district court's determination that "the Union does not need to show breach; it merely needs to allege it."

Cummins's arguments, however, would require us to consider the underlying merits of the claim, an inquiry prohibited by both *AT&T*, 475 U.S. at 648-51, and *Mead*, 21 F.3d at 131. As the district court held:

> The courts . . . have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.

(quoting from *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567-68 (1960)). The PSA clearly states that the parties agree to arbitrate any "alleged breach." Here, the Union alleges that Cummins breached the agreement by amending Plan B without its consent, and whether the Union is correct is for the arbitrator to decide. *See AT&T*, 475 U.S. at 648-51. We therefore agree with the district court's holding that the issue is arbitrable.

**D.     Cummins's laches defense**

Cummins's final argument is that the Union's suit is barred by laches. The district court disagreed, holding that "the delay was caused by the failure of the parties to communicate their respective positions," and that Cummins could not raise the defense when its failure to fully respond to the Union's September 3, 2003 letter was a significant cause of the delay.

Laches is an equitable defense to arbitration that is properly considered by the court rather than by the arbitrator. *Amalgated Clothing Workers of Am. v. Ironall Factories Co.*, 386 F.2d 586, 591-92 (6th Cir. 1967) (holding that the union's suit was barred by laches). The laches inquiry consists of two elements: (1) whether there was unwarranted delay, and (2) whether the delay was detrimental to the party raising the defense. *See id.* at 592. In *Ironall*, the court held that the union's claim was barred by laches where it failed to notify the company of the dispute until over one year after the dispute arose and six months after the company sold its assets, and where the union waited eleven months after its initial notification before requesting arbitration. *Id.* Because Ironall had sold its assets and "exist[ed] in name alone," the court held that the union's delay caused "serious impediments" to Ironall's ability to present a proper defense. *Id.*

The delay in the present case, though substantial, was not unwarranted. The Union first learned in November of 2001 that the pension plans had been merged. It filed a Notice of Intent to

Arbitrate just one month later. Over the next two-and-a-half years, the Union and Cummins exchanged many letters and telephone calls regarding the dispute and, as discussed above, the Union reasonably thought that Cummins was amenable to negotiating when Cummins not only participated in selecting an arbitrator in June of 2003, but also continued to ask the Union to clarify its position. In September of 2003, when the Union specifically asked Cummins to "advise within the next ten days" if it was refusing to arbitrate, Cummins ducked the inquiry and instead responded with yet another request for legal authority to support the Union's position. Cummins then failed to further communicate with the Union until March of 2004, despite two attempts by the Union (with letters dated October 15, 2003 and February 12, 2004) to determine if Cummins was willing to arbitrate the dispute.

The delay on the Union's part was therefore excusable under the circumstances. Because Cummins cannot satisfy the first element of the laches defense, we need not consider the prejudice element. *See Ironall*, 386 F.2d at 592. We therefore agree with the district court's holding that laches does not bar the Union's claim.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court and **REMAND** the case for referral to arbitration.